887 So.2d 98 (2004)
SUCCESSION OF Margaret Meyers HEBERT
Succession of Theodule Henry Hebert
Nos. 2003 CA 0531, 2003 CA 0532.
Court of Appeal of Louisiana, First Circuit.
September 17, 2004.
*99 Neil H. Mixon, Powers & Willard, L.L.C., Baton Rouge, for Appellant Althea Whitfield, Administratrix of the Succession of T.H. Hebert.
DeVan Pardue, Springfield, for Appellee Jeanne Hebert, Administratrix of the Succession of Margaret Meyers Hebert.
Before: PARRO, GUIDRY, and DOWNING, JJ.
PARRO, J.
In the succession proceeding for Margaret M. Hebert, the administratrix of her husband's succession filed a motion to traverse the detailed descriptive list relative to its ownership classification of a 10 foot by 40 foot burial plot in the Ponchatoula Municipal Cemetery. After recognizing Mrs. Hebert as the sole owner of the said plot, the trial court dismissed the motion to traverse. The administratrix of Mr. Hebert's succession appealed from that judgment, as well as two subsequent related judgments rendered in Mr. Hebert's succession proceeding, which incorporated this finding.

Factual Background and Procedural History
Margaret M. Hebert and Theodule Henry Hebert were married in the 1920s. To their union, three children were born, Delores Hebert (Delores), John H. Hebert (John), and Althea H. Whitfield (Althea). Mr. Hebert and Mrs. Hebert had been married previously and had children born to those marriages. Mr. Hebert had nine children from his prior marriage, including Lilly H. Fendlason and Jessie H. Rottman, and Mrs. Hebert had one child from her prior marriage.
Mr. Hebert died on April 14, 1952. Mrs. Hebert died on April 10, 1958. Their successions were not opened via court filings until 2002[1] and then each was opened separately in order to resolve an ownership dispute as to the 10 foot by 40 foot burial plot in the Ponchatoula Municipal Cemetery (Ponchatoula Cemetery) in which Mr. and Mrs. Hebert had been buried.[2] This dispute arose when Mrs. Fendlason's daughter, Joy Yochim, attempted to have her husband, Willard D. Yochim, Jr., buried in the plot in question. John's daughter, Jeanne Hebert (Jeanne), instructed cemetery officials not to allow the burial of Mr. Yochim in the plot in question as neither he nor Mrs. Yochim was a relative of Mrs. Hebert, who was the record owner. Despite Jeanne's objection, Mr. Yochim was buried in said plot.
Jeanne was appointed as administratrix of Mrs. Hebert's succession, as was Althea of Mr. Hebert's succession. In the detailed descriptive list filed in Mrs. Hebert's succession proceeding, Jeanne listed the burial plot as Mrs. Hebert's separate property. On the other hand, Althea took the position that the cemetery plot belonged to *100 the former community of acquets and gains that existed between Mr. and Mrs. Hebert. Her position was set forth in the detailed descriptive list filed in Mr. Hebert's succession proceeding, as well as a traversal of the detailed descriptive list filed by her in Mrs. Hebert's succession proceeding.[3] Subsequently, Jeanne filed a motion for summary judgment seeking a declaration that the cemetery plot in question was owned solely by the estate of Mrs. Hebert and seeking an order directed to the funeral home that was responsible for the burial of Mr. Yochim in said plot to remove his body therefrom and place it elsewhere. Jeanne's motion was denied by the trial court. Subsequently, the trial court conducted a hearing on Althea's traversal. Based on the evidence presented at that hearing, the trial court found that the burial plot was Mrs. Hebert's separate and paraphernal property. Accordingly, in a judgment dated October 9, 2002, Althea's motion to traverse was dismissed, and she was ordered to pay costs. Althea filed a suspensive appeal from that judgment.[4]
On November 21, 2002, a judgment was entered in Mr. Hebert's succession proceeding, granting a motion to consolidate the two succession proceedings and decreeing that Mr. Hebert's estate had no interest in the burial plot in question pursuant to the prior ruling made in Mrs. Hebert's succession proceeding. A similar judgment was also signed on November 25, 2002. Althea has also appealed from those two judgments.[5]
On appeal, Althea urged that the trial court legally erred in:
1. failing to give legal effect to the operation of the civilian doctrine of seizin embodied in LSA-C.C. arts. 934 and 935;
2. failing to apply LSA-C.C. art. 2452 regarding the sale of a thing by a non-owner;
3. failing to apply LSA-C.C. arts. 1837 and 1839 and finding that the bill of sale, which was not in authentic form or signed by Mrs. Hebert, could transfer title of the plot to Mrs. Hebert;
4. excluding all evidence relative to the issue of ownership, except the September 3, 1952 bill of sale;
5. classifying the burial plot in question as Mrs. Hebert's separate property; and
6. assessing Althea with court costs.

Motion to Traverse
The descriptive list of succession property authorized by LSA-C.C.P. art. 3136 shall be accepted as prima facie proof of all matters shown therein, unless amended or traversed successfully. Any interested person may traverse the descriptive list at any time, on contradictory motion served on the person filing it. LSA-C.C.P. art. 3137. Article 3137 clearly *101 states that the original descriptive list does not constitute prima facie proof once the mover's motion to traverse has been granted, and a copy of the traversed descriptive list shall be filed with the Department of Revenue.
Things in the possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove that they are separate property. LSA-C.C. art. 2340. Article 2340 establishes a presumption in favor of the community which can be rebutted by either spouse. Since this presumption is rebuttable, the article is procedural in nature and can be applied retroactively to the facts of this case. See Tullier v. Tullier, 464 So.2d 278, 282 (La.1985). The proper burden of proof in overcoming the presumption of community contained in Article 2340 is a preponderance of the evidence. Talbot v. Talbot, 03-0814 (La.12/12/03), 864 So.2d 590, 600. The party asserting the separate nature of the property acquired during the marriage has the burden of overcoming a strong presumption in favor of the community. Tullier, 464 So.2d at 283.
In her traversal, Althea asserted that the plot in question was community property, since it was acquired in the 1940s during the marriage of Mr. and Mrs. Hebert, and that property formerly belonging to the community served as the consideration in the exchange that resulted in the acquisition of the plot in question. Jeanne's adverse position was based on the fact that a "Bill of Sale" indicates that the plot in question was acquired by Mrs. Hebert after Mr. Hebert's death when the community no longer existed.
The document in question provided in pertinent part:
 Note: No charge due to error
 BILL OF SALE of selling plot purchased by
 Rottman to another person.
Town of Ponchatoula
 to
 Mrs. T.H. Hebert
 KNOW ALL MEN BY THESE PRESENTS, That in consideration of the sum
 of No charge Dollars, the receipt of which is hereby acknowledged, I, Gladys
 Dufreche Clerk, on the part of the Town of PONCHATOULA, LA., do hereby
 grant, sell, transfer and deliver unto Mrs. T.H. Hebert heirs, executors, administrators
 and assigns the following described lot of ground in the Ponchatoula Municipal
 Cemetery, viz: ... In Field 2 Immediately West of Sullivant Plot, measuring 40
 feet North and South by 10 feet East and West. Must comply with the rules and
 regulations as per plan of said cemetery. To have and to hold the said described
 lot of ground unto said Mrs. T.H. Hebert heirs and assigns forever.
 In testimony hereof I have hereunto affixed my official signature this the 3rd
 day of Sept. A. D., 1952.
 /s/ Mrs. Edward B. Dufreche

* * *
Following the presentation of evidence at the hearing on Althea's motion to traverse, the trial court stated in oral reasons that it would not consider the evidence that was offered to explain the "Bill of Sale" because it found no ambiguity in the (1) nature of the document, (2) property, (3) parties, and (4) consideration. In making these findings, the trial court recognized *102 that the stated consideration was "[n]o charge," with a notation as to the underlying reasons.[6] In written reasons, the trial court found that the notation did not create sufficient ambiguity so as to require parol evidence as to the nature of the bill of sale. In oral reasons, the trial court observed that Mrs. Hebert had not been charged in connection with the 1952 sale because there had been an error somewhere along the line, which was occasioned at a date and time after the death of Mr. Hebert. The error having occurred after the termination of the community, the trial court, without resort to parol evidence, declared the plot to be Mrs. Hebert's separate property.
Ownership interests in cemetery plots and rights to additional burials are established and regulated by statute, including the provision that "every right of interment and cemetery space shall be subject to the laws of Louisiana pertaining to community property." Katherine S. Spaht & W. Lee Hargrave, Matrimonial Regimes, § 2.4 at 30, in 16 LouisianaCivil Law Treatise (2d ed.1997), quoting LSA-R.S. 8:803. Though the rights of use of such plots and tombs may be limited because of the nature of cemeteries, they are nonetheless patrimonial rights subject to being included in the mass of community assets. Spaht & Hargrave, Matrimonial Regimes, § 2.4 at 30.
Currently, title and rights to cemetery plots are governed by LSA-R.S. 8:801 through 814. These provisions were enacted pursuant to 1974 La. Acts, No. 417, which amended and reenacted Title 8 of the Louisiana Revised Statutes of 1950, formerly containing LSA-R.S. 8:1 to 211. Clearly, the 1974 amendments to the laws governing cemeteries were not in effect when the plot in question was acquired; therefore, they are not applicable to the facts of this case. Accordingly, we must look to the substantive law that was in effect when the plot in question was allegedly acquired.
At the time of Mrs. Hebert's alleged acquisition in 1952, use rights relative to cemetery spaces were governed by LSA-R.S. 8:2 (West 1950),[7] which provided in pertinent part:
Any burial lot or tomb in any cemetery controlled by any company or association incorporated for cemetery purposes may, by the owner or owners, be conveyed or willed back to and held by the company or association in perpetual trust for its preservation as a place of burial, and shall thereafter remain forever inalienable by act of the parties. The right to use the lot or tomb as a place of burial of the dead of the family of the owner and his descendants shall descend from generation to generation unless the act of conveyance in trust provides that interments in the lot or tomb shall be confined to the bodies of specified persons, in which case the lot or tomb shall be forever preserved as the burial place of the persons specified in the act and shall never be used for any other purpose.
At that time, LSA-R.S. 8:1 (West 1950)[8] governed the form requirements for acts of conveyance of cemetery spaces and provided:

*103 Religious denominations, congregations, and other associations which own land destined as a place for the interment of the dead may convey parts or lots thereof, or tombs located therein, for interments. The acts of conveyance may be passed under the form prescribed by the by-laws or resolutions of the denomination, congregation, or association.
Acts so made are equally authentic and impart full proof as if passed before a notary and two witnesses. It is not necessary to record them in any public office.
When Mr. Hebert allegedly acquired an ownership interest in the plot in question in the 1940s, the previously quoted provisions were not in effect. The applicable governing law was found in section 387 of the Louisiana Revised Statutes (Wolff 1920), which provided in pertinent part:
All religious denominations and congregations of this State, and all other associations which now own, or may hereafter own, any portion of land destined as a place for the interment of the dead, shall have the right to sell, convey and transfer such parts, fractions or lots of the same, as may be necessary and proper for interments; the acts of sale, conveyance and transfer shall be passed under such form as may be prescribed by the by-laws or special resolutions of the religious denominations and congregations or other associations. Acts of sale so made shall be equally authentic and impart full proof as if they had been passed before a Notary Public and two witnesses. It shall not be necessary to record them in any public office, nor shall it be lawful for the Recorder of Mortgages in any city or parish of this State to record or to certify the existence of any privilege or mortgage bearing on said lots.
Additionally, relative to the conveyance, devise, use, and preservation of burial lots and tombs in cemeteries, 1908 La. Acts, No. 190, § 1, provided in pertinent part:
[A]ny burial lot or tomb in any cemetery controlled by any company or association incorporated for cemetery purposes under any general or special law of the State of Louisiana, may, by the owner or owners, be conveyed or devised back to and held by such company or association in perpetual trust for the purpose of its preservation as a place of burial, and shall thereafter remain forever inalienable by act of the parties, but the right to use the same as a place of burial of the dead of the family of the owner and his descendants shall descend from generation to generation unless the deed of conveyance in trust shall provide that interments in such lot or tomb shall be confined to the bodies of specified persons, in which case such lot or tomb shall be forever preserved as the burial place of the persons specified in the deed and shall never be used for any other purpose whatever....
The municipal governing authority was vested with the power and authority to establish by ordinance or resolution all rules and regulations deemed necessary in its discretion for a public cemetery not inconsistent with the law. 1936 La. Acts, No. 49, § 4. Section 7 of Act 49 authorized such governing authorities to establish lots, plots, or burial spaces within such public cemeteries and to issue permits for interment therein of deceased persons, or to sell any such lot, plot, or burial space to the public at terms to be fixed by such governing authority, the same, however, to be used and maintained exclusively for burial purposes and subject to present and future laws of this state and ordinances of said municipality governing public cemetery and burial grounds.
*104 Thus, whether transferred by Ponchatoula in the 1940s to Mr. Hebert or in the 1950s to Mrs. Hebert, the governing law would have been virtually the same, that is, form requirements for an act of sale were governed by the by-laws or special resolutions or ordinances of Ponchatoula, rather than those pertaining to the transfer of immovable property found in the Louisiana Civil Code, as suggested by Althea.[9]See Petit v. Depass, 5 La.App. 40 (La.App.Orl.1926). Compliance with such form requirements rendered the act authentic.
The record does not contain any evidence as to the by-laws or any applicable resolutions or ordinances that may have been adopted by Ponchatoula. Assuming for the sake of argument that the September 3, 1952 bill of sale satisfied any such form requirements, we recognize that Ponchatoula, as the owning body, would be bound by the authentic character of the title it issued. Furthermore, if the bill of sale conclusively showed ownership in a particular person, parol evidence should not be allowed to prevail against the title as issued. See Farelly v. Metairie Cemetery, 44 La. Ann. 28, 10 So. 386, 387 (1891).
The document in question purports to be an act of sale. At all pertinent times, a contract of sale was defined as an agreement by which one gives a thing for a price in current money, and the other gives the price in order to have the thing itself. Three circumstances concur to the perfection of the contract, to wit: the thing sold, the price, and the consent. LSA-C.C. art. 2439 (1870).[10] Louisiana Civil Code article 2464 (1870)[11] sets forth the essential elements of price as follows:
The price of the sale must be certain, that is to say, fixed and determined by the parties.
It ought to consist of a sum of money, otherwise it would be considered an exchange.
It ought to be serious, that is to say, there should have been a serious and true agreement that it should be paid.
It ought not to be out of proportion with the value of the thing; for instance the sale of a plantation for a dollar could not be considered as a fair sale; it would be considered as a donation disguised.
The intent of all the parties is to be determined by the words of the contract when these are clear and explicit and lead to no absurd consequences. LSA-C.C. art.1945 (1870).[12] Whether the terms of a *105 contract are ambiguous is a question of law. Appellate review of questions of law is simply to discern whether the trial court's interpretive decision is legally correct. Busby v. Cappaert Manufactured Housing, Inc., 01-496 (La.App. 3rd Cir.10/3/01), 799 So.2d 608, 610. If legal error is found, an appellate court is to make a de novo review. See Gonzales v. Xerox Corp., 320 So.2d 163, 165-166 (La.1975).
The document in this case does not provide for the payment of any sum of money, but states the sale was made for the "consideration of the sum of No charge Dollars." The associated notation indicates no sum would be required because of an error by the owning body, indicating that the transaction was something other than what it purported to be, probably an exchange. An exchange is a contract, by which the parties to the contract give to one another, one thing for another, whatever it be, except money; for in that case it would be a sale. LSA-C.C. art. 2660 (1870).
The purported parties to the 1952 contract were the "Town of PONCHATOULA" and "Mrs. T.H. Hebert." Under the terms of the agreement, Ponchatoula transferred to Mrs. Hebert the lot of ground in the Ponchatoula Cemetery in Field 2 immediately west of the Sullivant Plot. There was no indication that Mrs. Hebert gave anything to Ponchatoula in return. The notation suggests that a third party, Rottman, had previously provided the consideration for the underlying transaction. Thus, we disagree with the trial court's conclusion that the "Bill of Sale" is clear and unambiguous. In light of the ambiguity presented by the act of transfer, we conclude that the trial court's ruling to the contrary constituted legal error.
In making our de novo review as a consequence of this legal error, we find it appropriate to consider the parol evidence offered to show the nature of Mrs. Hebert's ownership interest in the burial plot in question (the replacement plot). As the mover, Althea had the burden of proving her claim by a preponderance of the evidence. See Leleux v. Viator, 55 So.2d 662, 667 (La.App. 1st Cir.1951). In addition to her own testimony, Althea offered the testimony of the following in support of her claim that the replacement plot was community property: Julian Dufreche (Dufreche), Ponchatoula's Mayor; Mrs. Rottman; Rosemary LeBourgeois (LeBourgeois), former city clerk for Ponchatoula; Lerlean Rottman Gilner (Gilner), Mrs. Rottman's daughter; and Mrs. Yochim.
Dufreche testified that his duties as mayor of Ponchatoula included the management of the Ponchatoula Cemetery, which was acquired by the city in 1935. He explained that the replacement plot was located in the portion of the cemetery owned by the city and not the section owned by the Catholic church. According to Dufreche, the "Bill of Sale" to Mrs. Hebert is the only title relative to this plot in the cemetery records. The former city clerk for Ponchatoula, LeBourgeois, testified that the cemetery records were scarce, primitive, and disorganized when she took office in 1964. She was charged with sorting and organizing the paperwork that was in the city's possession in connection with the upcoming move into a new city hall building. LeBourgeois was not aware of the existence of a plot map or book of deeds for the cemetery. She recounted that the city did not have any record of deeds that were issued prior to 1964. However, she explained that such information may have been in the possession of the person who had contracted with the city concerning the operation of the cemetery. Pursuant to the contract, that *106 person was responsible for selling plots, preparing the necessary paperwork, and disbursing the deeds.
According to Dufreche, the "no charge" notation indicated that a person mistakenly buried someone in a plot belonging to another.[13] By this notation, the Town of Ponchatoula conceded that a plot owned by "Rottman" had been sold by it to someone else, prompting the replacement or exchange of that plot with the plot at issue in this case. In further explanation of the notation, Mrs. Rottman, Mr. Hebert's daughter from his prior marriage, testified that subsequent to the death and burial of her half-sister, Delores, in 1925, she and her father discovered that a non-family member had been mistakenly buried in the plot previously purchased by Mr. Hebert.[14] She and Mr. Hebert visited the cemetery in the 1940s and discussed the improper burial with Ponchatoula's then mayor, Smythe Guthrie, and Harry McKneely of the funeral home, who was in charge of cemetery operations at that time.[15] Mrs. Rottman explained that, rather than disturbing the graves of Delores and the other family members who had been buried in that plot,[16] Mr. Hebert opted to obtain a replacement plot, for which no money was given. According to Mrs. Rottman, she, Mr. Hebert, Mr. Guthrie, and Mr. McKneely walked around the cemetery grounds, and Mr. Hebert selected the spot where he was later buried. Mrs. Rottman recalled that she witnessed only a handshake and never saw a deed to the replacement plot.
Furthermore, Mrs. Rottman stated that she and her deceased husband had acquired a 20 foot by 40 foot plot in the Catholic section of the cemetery, in which her newborn son had been buried, that also involved an improper burial. On account of this error in burial, the Rottmans obtained another plot over which they placed the family name, "Rottman," and transferred the remains of their infant son into that plot. Mrs. Rottman could not recall the plot number or the year in which her replacement plot had been acquired; however, she testified that she held a deed for it, which she believed to be stored at a bank. Mrs. Rottman denied that the plot given in exchange to Mrs. Hebert for the replacement plot [17] belonged to the Rottman Family; to the contrary, the essence of her testimony was that the plot transferred to Mrs. Hebert was the same plot selected by Mr. Hebert in the 1940s in exchange for the original plot acquired to bury Delores in 1925.
Dufreche explained that there is no record that Mr. Hebert ever owned a plot in the cemetery. However, the cemetery *107 records also do not reflect any plot ownership by "Rottman," yet the notation on the "Bill of Sale" reveals just the opposite. We discern from the testimony of LeBourgeols and Rottman that such records quite possibly were lost or were never incorporated into the cemetery records kept by the city. After thoroughly considering the entire record, we find that Althea has shown by a preponderance of the evidence that the notation's reference to a plot purchased by "Rottman" was erroneous, and that such reference should have instead been to "Hebert." Therefore, since no price was given, we conclude that the "Bill of Sale" executed in 1952 actually evidenced an exchange.
In determining if the property acquired by Mrs. Hebert in 1952 was her separate property, we must examine the nature of the property given as consideration for the exchange. The record established by a preponderance of the evidence that the property given was the plot acquired by Mr. Hebert in 1925, at a time when Mr. and Mrs. Hebert were shown by the evidence to have been married, in which Delores and three other family members had been buried. The evidence reasonably supports that Ponchatoula Cemetery's subsequent mistaken burial of a non-family member in the plot acquired in 1925 prompted the exchange in question.
Having been purchased by Mr. Hebert and possessed by Mr. and Mrs. Hebert during the existence of a regime of the community of acquets and gains, the plot that was purchased in 1925 is presumed to be community. See LSA-C.C. art. 2340. As the representative of Mrs. Hebert's succession, Jeanne produced no evidence to prove that Mrs. Hebert had exchanged her separate property for the replacement plot. Property received in an exchange partakes of the same character as that given. Kittredge v. Grau, 158 La. 154, 103 So. 723, 725 (1922). Thus, the replacement plot received by Mrs. Hebert in the exchange would partake the community character of the property given. The 1952 transfer to Mrs. Hebert provided documentation of the exchange of the 1925 plot for the plot selected by Mr. Hebert in the 1940s.
Having determined that the plot in question was acquired as a result of an exchange of property belonging to the former community of Mr. and Mrs. Hebert, we conclude that Althea successfully traversed the detailed descriptive list filed in Mrs. Hebert's succession proceeding by showing that the plot in question was community property. Based on the evidence offered at the hearing on the motion to traverse, we find that Mr. Hebert's succession owns an undivided one-half interest in the plot in question. Therefore, we find the trial court erred in dismissing Althea's motion to traverse and ordering her to pay costs. For the same reason, we find error in the subsequent judgments in the consolidated proceedings relative to the detailed descriptive list filed in Mr. Hebert's succession proceeding.

Motion for Remand
Althea has filed a motion for remand, seeking to have this court remand this matter to the trial court for an evidentiary hearing and a determination as to the date on which Mr. and Mrs. Hebert were married. The motion is based on her alleged subsequent discovery that the marriage of her parents occurred on January 7, 1926, rather than on January 7, 1920, as she previously believed based on an allegedly altered marriage certificate possessed by her family. She urges that after considering this new evidence, the trial court would find that the marriage occurred in 1926, rather than in 1920, thereby supporting the classification of the replacement *108 plot as Mr. Hebert's separate property. This theory is based on the concept that property received in an exchange partakes of the same character as that given. Kittredge, 103 So. at 725. If indeed the marriage occurred after Mr. Hebert purchased the original plot in which Delores was buried in 1925, the original and replacement plots would have been Mr. Hebert's separate property. However, at the heart of the dispute between the Hebert heirs is whether Mr. Hebert held an ownership interest in the replacement plot so as to establish interment rights with respect to all of his descendants. Whether he owned the plot as his separate property or as a co-owner of community property, the right of his descendants to be buried there would not be affected by the date on which he married Mrs. Hebert.[18] Because Althea has failed to show what practical effect the particular classification of Mr. Hebert's ownership interest in the replacement plot would have on the determination of the interment rights of Althea and her blood siblings, we find no good ground to exercise our discretion to grant her motion for a remand for the purpose of a new trial; thus, her motion for a remand is denied.[19]

Decree
For the foregoing reasons, the October 9, 2002 judgment is reversed. Judgment is rendered granting the motion to traverse filed by Althea and declaring that the 10 foot by 40 foot burial plot belonged to the community of acquets and gains of Mr. and Mrs. Hebert. Accordingly, the detailed descriptive list that was filed in Mrs. Hebert's succession proceeding is amended to reflect an undivided one-half ownership interest in and to a 10 foot by 40 foot burial plot in the Ponchatoula Cemetery in Field 2 immediately west of the Sullivant Plot. The costs of the trial court proceeding relative to the traversal are assessed to Mrs. Hebert's succession.
The portion of the November 21, 2002 judgment that declared Mr. Hebert's estate had no interest in the 10 foot by 40 foot burial plot is reversed, and judgment is rendered declaring that the succession of Mr. Hebert has an undivided one-half ownership interest in and to a 10 foot by 40 foot burial plot in the Ponchatoula Cemetery in Field 2 immediately west of the Sullivant Plot. The November 25, 2002 judgment is vacated.
All costs of this appeal are assessed to Mrs. Hebert's succession. Furthermore, the motion for a remand filed by Althea Whitfield is denied, and the related costs are assessed to Mr. Hebert's succession.
OCTOBER 9, 2002 JUDGMENT REVERSED AND JUDGMENT RENDERED; NOVEMBER 21, 2002 JUDGMENT REVERSED IN PART AND JUDGMENT RENDERED; NOVEMBER 25, 2002JUDGMENT VACATED; MOTION TO REMAND DENIED.
NOTES
[1] At the time of these filings, Althea was the only living child born of the marriage of Mr. and Mrs. Hebert.
[2] Subsequently, John was buried in this plot next to his mother.
[3] Mrs. Yochim joined with Althea in the filing of the traversal.
[4] The motion for a suspensive appeal was combined with a motion to stay both succession proceedings during the pendency of the appeal. Although a contradictory hearing was scheduled for the request for a stay, there is no evidence in the record of any ruling on this motion.
[5] Once the November 21, 2002 judgment was signed consolidating the two proceedings, the trial court was divested of jurisdiction of the issues resolved in Mr. Hebert's proceeding because of the appeal that was filed on November 6, 2002, in Mrs. Hebert's proceeding. See LSA-C.C.P. art.2088. Accordingly, the trial court was without jurisdiction to render the judgment signed on November 25, 2002, even though the handwritten language merely clarified that the written reasons for judgment were in Mrs. Hebert's succession proceeding.
[6] As to the notation inserted at the top of the document, the trial court orally noted the lack of any supporting written documentation. Because the notation referred to a sale to Rottman, not Mr. Hebert, the trial court declined to find that Mr. Hebert owned an interest in the plot in question.
[7] Cemetery space use rights are now addressed in LSA-R.S. 8:805.
[8] Such formalities are now governed by LSA-R.S. 8:812.
[9] Interments in lots in cemeteries were governed by the rules and regulations of the owning body. See Farelly v. Metairie Cemetery, 44 La. Ann. 28, 10 So. 386 (1891).
[10] LSA-C.C. art. 2439 was amended and reenacted by 1993 La. Acts, No. 841, § 1, effective January 1, 1995, to provide: "Sale is a contract whereby a person transfers ownership of a thing to another for a price in money. The thing, the price, and the consent of the parties are requirements for the perfection of a sale."
[11] LSA-C.C. art. 2464 was amended and reenacted by 1993 La. Acts, No. 841, § 1, effective January 1, 1995, to provide:

The price must be fixed by the parties in a sum either certain or determinable through a method agreed by them. There is no sale unless the parties intended that a price be paid.
The price must not be out of all proportion with the value of the thing sold. Thus, the sale of a plantation for a dollar is not a sale, though it may be a donation in disguise.
[12] By virtue of 1984 La. Acts, No. 331, § 1, effective January 1, 1985, the substance of former LSA-C.C. art.1945(3) was reproduced in LSA-C.C. art.2046, which provides: "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."
[13] LeBourgeois' testimony corroborates the possibility of such a happening.
[14] Gilner described this plot as being located in the northeast section of the Ponchatoula Cemetery a distance from where Mr. Hebert was buried.
[15] Although Althea was not present at the time of the dealings in the 1940s, she testified that she learned from her parents that Mrs. Rottman was present when the transaction occurred.
[16] According to Mrs. Rottman, four family members were buried in the plot acquired by Mr. Hebert in 1925:(1) Delores; (2) Mrs. Rottman's niece, Rita; (3) Mrs. Rottman's brother, Patrick Hebert (Patrick); and (4) Patrick's son, Charles. The burial of these family members in the original plot was corroborated by Althea's testimony. Mrs. Rottman reported that Delores and Rita are still buried in the original plot; however, the remains of Patrick and Charles were removed from the original plot by Patrick's wife.
[17] According to Althea, the following family members are buried in the replacement plot: Mr. Hebert; Mrs. Hebert; her brother, John; and Mr. Yochim.
[18] We conclude that the official marriage record, relied on by Althea as grounds for a remand for a new trial, could have been discovered by due diligence before the hearing on the traversal, and thus that record does not constitute new evidence warranting a new trial. Nor do we find that any of the other peremptory grounds in LSA-C.C.P. art.1972 mandating the grant of a new trial are applicable in this case.
[19] In so ruling, we note that Mrs. Hebert's son from her prior marriage is already deceased and is buried in a different cemetery.