KUHN, J.
12Pr. Ralph Slaughter (Dr. Slaughter), appeals the trial court’s judgment, denying his claim against the Board of Supervisors of Southern University and Agricultural and Mechanical College System (Board) for past due wages. We amend and, as amended, affirm.
BACKGROUND
Dr. Slaughter was employed as the President of the Southern University System in April 2006. In September 2007, Dr. Slaughter and the Board executed a written employment contract for a two year term, commencing on July 1, 2007 and ending on June 30, 2009. Paragraph 11 of the employment contract expressly provided that the contract was effective only upon the execution of a settlement agreement and release (and dismissal with prejudice) in a then-pending “unlawful retaliation” civil rights lawsuit filed by Dr. Slaughter against the Board and others in federal court. The pertinent compensation provisions of the employment contract are as follows:
3. For the services to be rendered by the President, his earned compensation shall be:
a) A base salary of $220,000 per an-num;
b) A vehicle allowance of $1,000 per month;
c) The full use and control of the University Place located on the Baton Rouge campus for official University functions. While not in residency in this University Place, he shall be paid a monthly housing/living allowance of at least $3,000 per month, with reasonable adjustments made periodically to reflect costs of living increases; and
d)A salary supplement from Southern University System Foundation funds in the amount of $200,000 per year. The salary supplement is contingent upon the funds being provided by the Foundation.
*441 |sThe settlement agreement and release provided that the agreement “becomes effective only upon execution of the Employment Contract attached as Exhibit A, the execution of the settlement agreements with the individual defendants in this action, and the dismissal with prejudice of the litigation.” Another pertinent provision of the settlement agreement and release, signed on August 29, 2007, is as follows:
15.
The Parties agree a) that the settlement agreement is not contingent upon the Board of the Southern University Foundation approving the salary supplement contained in the Employment Contract; b) that it is not a condition of the settlement agreement and there are no representations or warranties that the Employment Contract complies with all applicable law and regulations, including but not limited to La. R.S. 42:1111 A(2), La. R.S. 42:1115 B, La. R.S. 17:3351 and the Board of Regents Administrative Salary Policy; and c) that the Defendants have no obligation and have made no representations regarding the tax consequences of all or any part of said salary supplement or the eligibility of such salary supplement to be considered for any retirement benefit, purpose or calculation, including but not limited to the limitations in La. R.S. 11:231 and any statutes or regulations relating to LASERS.
On September 20, 2007, the Board executed two different Southern University System Personnel Action Forms indicating Dr. Slaughter’s employment as System President was for the period of July 1, 2007 to June 30, 2009. One form indicates that the recommended and budgeted salary for Dr. Slaughter was $220,000 and the source of those funds was “State — General Fund Direct.” The second form is almost identical, but differs in that the “salary adjustment” amount is $200,000 and the source of funds is “Restricted Funds— SUS Foundation.” Copies of portions of Dr. Slaughter’s employment contract (paragraph three, providing for Dr. Slaughter’s earned compensation, and the signature page) were attached to each personnel action form.
14A letter dated September 25, 2007, from Ernie Troy Hughes, the Executive Director of the Southern University Foundation (Foundation), to Mr. Tolor White, the Southern University System Vice President Finance, states that the Foundation “will support and make salary supplements for the extra compensation to President Ralph Slaughter, as approved by the Southern University Board of Supervisors in the amount of $200,000.00 annually from funds designated for that purpose.” The Foundation’s by-laws provide the Foundation shall “[ojperate principally for the benefit of the Southern University and A & M College System” and “may enter into contracts, cooperative endeavor agreements, and/or any other legally binding instruments on behalf of or for the benefit of the Southern University System.” The by-laws also provide the Foundation shall “not engage in any activities, other than those which are exclusively for benevolent, charitable, scientific, literary or educational purposes [and] [njever allow or permit any part of the net earnings or assets of this corporation to insure in whole or in part to the benefit of any private member or individual.”
When Dr. Slaughter’s contract as the System President was not renewed, his employment ended on June 30, 2009. Dr. Slaughter retired as a state employee with approximately 35 years of service, effective July 1, 2009. The Louisiana State Employees Retirement System (LASERS) application form filed by Dr. Slaughter elect *442 ed to convert all unused leave, less hours of leave paid by the employing agency, to retirement credit. According to the Southern University Personnel Handbook, “[t]erminal payment of an academic or unclassified employee may not exceed an amount representing: 300 hours of unused annual |5leave at the time of termination for any reason [and] 200 hours of unused sick leave upon retirement or death prior to retirement.” .
On August 20, 2009, Dr. Slaughter wrote to the Board that he had not received his “earned compensation” payment for 500 hours of leave. He requested immediate payment of his wages due and immediate transfer of his “wage/compensation credits” (leave service credit) to LASERS. Dr. Slaughter indicated his request for payment of leave was acknowledged by the System on July 10, 2009, and the total amount due was $112,500.00, less applicable tax deductions, based on an hourly rate of $225 per hour times 500 hours of leave.
Dr. Slaughter filed suit on September 4, 2009, against the Board for past due wages pursuant to La. R.S. 23:632. Dr. Slaughter alleged that despite his written demands, the Board failed to pay the correct amount owed to him for the unused leave. He also sought attorney fees, penalties, and to proceed by summary proceeding, as provided in La. R.S. 23:632 and La. C.C.P. art. 2592(12).
In a letter from Interim System President Kassie Freeman on September 9, 2009, the Board responded that Dr. Slaughter’s LASERS leave certification form was transmitted on August 20, 2009, and that the processing of his terminal pay was being authorized. The letter advised Dr. Slaughter that his “failure to properly complete the university check-out process delayed the processing of [his] terminal pay because terminal pay is not processed until after the check-out is completed.” On September 24, 2009, the Southern University System sent a check to Dr. Slaughter in the amount of $30,885.22 for his terminal pay. The cover letter from Interim System President Freeman stated the payment represented the total annual Rand sick leave, less all applicable deductions, and provided a detailed calculation as follows:
1. Gross Terminal Pay 100,960.00
2. Federal Taxes 32,186.59
3. State Taxes 4,958.20
4. Disputed Amount* 30,431.85
5. Employee Pay Back (Housing) 2,723.14
6. LASERS (225.00)
Net Terminal Pay 30,885.22
*443 This matter was tried by summary proceeding in December 2009. After testimony was received and exhibits were introduced at the trial, the trial court ruled in favor of the Board, with oral reasons, and assessed costs against Dr. Slaughter. Thereafter, Dr. Slaughter filed a motion for new trial and a ^supplemental motion for new trial, which were denied by the trial court. The written judgment was signed on February 4, 2010.[1]
Trial Court’s Judgment
The written judgment signed by the trial judge decreed, in pertinent part:
Southern University was justified in making withholdings from Dr. Slaughter’s terminal pay for missing equipment, furniture, and overpayment of one month’s housing allowance and that the delay in the final payment was reasonable given the investigation Southern University conducted regarding the missing items. Therefore, Southern University will not be subject to any attorney’s fees or penalties for the delay in processing Dr. Slaughter’s terminal pay.
... Dr. Slaughter’s terminal pay (500 hours of unused leave) and retirement should have been calculated only on his $220,000.00 annual base salary due from Southern University. Dr. Slaughter is, therefore, entitled to payment of 500 hours of unused sick and annual leave at $105.77 per hour for a total of $52,884.62 prior to deduction for taxes, missing furniture and equipment, and overpayment of one month’s housing allowance.
From this amount, Southern University was entitled to deduct $9,829.00 for four computers assigned to Dr. Slaughter and $18,816.27 for equipment and furniture purchased for Southern University by the Southern University System Foundation and $2,728.14 for an overpayment of his housing allowance. The University was not entitled to deduct from Dr. Slaughter’s terminal pay the amount of $1,286.58 for “Vivid Images” or a $500.00 invoice for a Lou Brock jersey.
Therefore, Dr. Slaughter’s terminal pay is calculated as a gross amount of $52,884.62 less deductions of [$]9,829.00, $18,816.27, and $2,728.14 which leaves a net terminal pay amount of $21,516.21 before deductions for taxes, which have not been calculated by the court.
|8Pr. Slaughter is only entitled to $21,516.21 before deductions from taxes. Southern University has already paid Dr. Slaughter a net terminal pay of $30,885.22 after the deduction[s] at issue in this case and deductions for taxes and benefits. Therefore, Dr. Slaughter is not entitled to any additional payments from Southern University.
Oral Reasons for Judgment
In his oral reasons for judgment, the trial judge reviewed the terms of Dr. Slaughter’s employment contract and the settlement agreement and noted that the salary supplement was contingent upon *444 payment by the Foundation and was not an obligation of Southern University. The judge further stated that under La. Const. Art. X, § 10 and LASERS, Dr. Slaughter was not entitled to have the supplemental salary payment or allowances included in the calculation of his retirement or severance benefits. The judge concluded that the 500 hours of leave was to be paid based on the base salary of $220,000.00 per year, which equated to an hourly rate of $105.77. The judge further concluded that several deductions were proper from the gross amount due of $52,884.62, including federal taxes (that the judge had not calculated), and an overpayment for one month of housing allowance. Other deductions included, “[a]t a minimum, the items improperly taken without authority by Dr. Slaughter from the Southern University campus” totaling $9,829.00 for computers and $18,816.27 for furnishings and fixtures. The judge further concluded the total amount owed to Dr. Slaughter was $21,516.21 before a deduction of taxes from the gross amount. The judge concluded that because Dr. Slaughter had already received a payment of more than the amount owed, he was not entitled to any further payment. In the judge’s oral reasons, he stated:
Now, the weekend prior to his last day, Dr. Slaughter emptied his office and the stadium suite of just about anything that wasn’t nailed down, and he even took things that were nailed or screwed to the walls and windows. Clearly, he took a great deal to which he had |flno claim or right. While this is not a suit for conversion or theft, this fact must be recognized and cannot be understated. Southern University, from the first day after his departure, attempted to inventory and calculate the value of the property inappropriately taken by Dr. Slaughter. Dr. Slaughter himself created chaos with regard to the items taken, such chaos that it was difficult for Southern University to determine just what had been taken without authority or justification by Dr. Slaughter, that Southern University’s failure ... to tender final payment of unused vacation and accrued sick leave was legally justified.... This bona fide dispute over what was actually owed, justified Southern University in withholding payment, and therefore, Dr. Slaughter is not entitled to penalties or attorney’s fees.
Southern University was justified in seeking a credit or setoff for items paid for with Foundation funds[,] which were improperly removed from the campus by Dr. Slaughter, as they became state property upon delivery to Southern University. In support of this, I adopt the legal memoranda from the defendants on law regarding property control for state agencies as further support on the issue.[2] ...
Now, this is not a trial for theft or conversion, but throughout the course of the last four days, this court has been shocked to learn of the abuses of authority and the abuse of position of power that Dr. Slaughter exhibited during his tenure. His testimony from the stand was the least credible testimony I have heard in thirteen years as a judge. It’s clear at this time that a very, very dark era at Southern University passed on June 30th of 2009 when Dr. Slaughter finally left that campus.
Assignments of Error
Dr. Slaughter raised nine assignments of error as follows:
*445 1. The district court erred in refusing to include supplemental compensation, paid by a bona fide Foundation to the State of Louisiana on behalf of the employee, where the law, specifically, La. R.S. 42:1102, La. R.S. 42:1111(A)(1), La. R.S. 11:403(10), requires that said amounts not only be (and were) fully taxed but also comprise “compensation and benefits from the government to which he is duly entitled.”
2. The district court erred in ordering the employee’s retirement system, LASERS, to “recalculate” the employee’s retirement when: 1) the issue was never before the Court in this wage suit; 2) the law applicable to LASERS specifically, La. R.S. 42:1102, 110La. R.S. 42:1111(A)(1), La. R.S. 11:403(1), and binding Louisiana Supreme Court jurisprudence, requires that supplemental compensation be part and parcel of an employee’s retirement income; and, 3) the employer, itself, reported all of the income, including the taxed supplemental compensation in its report of income to LASERS and recognized the full amount in its “tender” of undisputed wages to the employee.
3. The district court erred in imposing numerous offsets against the employee’s wages consisting of items purchased by a nonparty to this litigation— many of which were fully accounted for, items that were never assigned to the employee in accordance with Louisiana law, specifically, La. R.S. 39:330A and LPAA Regulations, items that had already been reported as “unlocated” in accordance with law.
4. The district court erred in offsetting an alleged housing allowance overpayment especially when there was no competent evidence of same introduced at trial of this matter.
5. The district court erred in refusing to recuse itself where, as here, the last two (2) witnesses testified to receiving various orders and directions from the Judge’s wife, who is also Louisiana Commissioner of Administration, and the district court prejudicially relied upon same and, further, where the district court evidenced clear bias against both the employee and his counsel, including urging the employee to sue his counsel for “malpractice” as the Court stated if it were him “I would.”
6. The district court erred in refusing to award the employee the entirety of his accrued 500 hours of leave calculated upon his gross earnings of $468, 000.00/year.
7. The district court erred in refusing to impose penalty wages upon the employer where the employer improperly withheld the employee’s pay for over two (2) months and the employer also refused to make a timely tender of any uncontested sums.
8. The district court erred in refusing to award the employee attorney’s fees.
9. The district court erred in unilaterally rejecting plaintiffs timely motion for new trial without a hearing and in unilaterally rejecting plaintiffs motion to supplement and amend his timely motion for new trial without a hearing.
InSTANDARD OF REVIEW
Appellate review of a trial court’s, factual findings is governed by the manifest error-clearly wrong standard. Stobart v. State, through Dep’t of Transp. and Dev., 617 So.2d 880, 882 (La.1993). Furthermore, when findings are based on determinations regarding credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact’s findings; for only the fact finder can be *446 aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where a fact finder decides to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989).
To reverse a trial court’s factual finding, an appellate court must find that a reasonable factual basis does not exist in the record for the finding of the trial court. If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Thus, when there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, although the appellate court may feel that its own evaluations and inferences are as reasonable. Schuyten v. Superior Systems, Inc., 2005-2358 (La.App. 1st Cir.12/28/06), 952 So.2d 98, 102-03; Cleary v. LEC Unwired, L.L.C., 2000-2532 (La.App. 1st Cir.12/28/01), 804 So.2d 916, 919.
Appellate review of legal questions simply involves a de novo determination as to whether the trial court’s decision was legally correct. Hogan 12v. Morgan, 2006-0808 (La.App. 1st Cir.4/26/07), 960 So.2d 1024, 1027, writ denied, 2007-1122 (La.9/14/07), 963 So.2d 1000; In re Succession of Hebert, 2003-0531 (La.App. 1st Cir.9/17/04), 887 So.2d 98, 105, writ denied, 2004-2571 (La.12/17/04), 888 So.2d 872; Sumrall v. Bickham, 2003-1252 (La.App. 1st Cir.9/8/04), 887 So.2d 73, 78, writ denied, 2004-2506 (La.1/7/05), 891 So.2d 696.
APPLICABLE LAW AND ANALYSIS
The Louisiana Wage Payment Act, La. R.S. 23:631, et seq., provides for payment of wages due after termination of employment. The main purpose of the wage payment law is to compel an employer to pay the earned wages of an employee promptly after his dismissal or resignation and to protect discharged Louisiana employees from unfair and dilatory wage practices by employers. Berard v. L-3 Communications Vertex Aerospace, LLC, 2009-1202 (La.App. 1st Cir.2/12/10), 35 So.3d 334, 342, writ denied, 2010-0715 (La.6/4/10), 38 So.3d 302.
La. R.S. 23:631 provides, in pertinent part:
A. (l)(b) Upon the resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday for the pay cycle during which the employee was working at the time of separation or no later than fifteen days following the date of resignation, whichever occurs first.
(2) Payment shall be made at the place and in the manner which has been customary during the employment, except that payment may be made via United States mail to the laborer or other employee, provided postage has been prepaid and the envelope properly addressed with the employee’s or laborer’s current address as shown in the employer’s records. In the event payment is made by mail the employer shall be deemed to have made such payment when it is mailed. The timeliness of the mailing may be shown by an Inofficial United States postmark or other official documentation from the United States Postal Service....
*447 B. In the event of a dispute as to the amount due under this Section, the employer shall pay the undisputed portion of the amount due as provided for in Subsection A of this Section. The employee shall have the right to file an action to enforce such a wage claim and proceed pursuant to Code of Civil Procedure Article 2592....
D. (1) For purposes of this Section, vacation pay will be considered an amount then due only if, in accordance with the stated vacation policy of the person employing such laborer or other employee, both of the following apply:
(a) The laborer or other employee is deemed eligible for and has accrued the right to take vacation time with pay.
(b) The laborer or other employee has not taken or been compensated for the vacation time as of the date of the discharge or resignation.
(2) The provisions of this Subsection shall not be interpreted to allow the forfeiture of any vacation pay actually earned by an employee pursuant to the employer’s policy.
La. R.S. 23:682 provides for the assessment of penalties and attorney fees for the failure to pay wages, as follows:
Any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee’s daily rate of pay, or else for full wages from the time the employee’s demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.
La. R.S. 23:635 provides that the assessment of fines against employees or the deduction of a sum as fines from wages due is unlawful, as follows:
|uNo person, acting either for himself or as agent or otherwise, shall assess any fines against his employees or deduct any sum as fines from their wages. This Section shall not apply in cases where the employees wilfully or negligently damage goods or works, or in cases where the employees wilfully or negligently damage or break the property of the employer, or in cases where the employee is convicted or has pled guilty to the crime of theft of employer funds, but in such cases the fines shall not exceed the actual damage done.
La. R.S. 42:1111, in the Code of Governmental Ethics, governs the payment of services to public servants from nonpublic sources, in pertinent part:
A. (1) Payments for services to the governmental entity. No public servant shall receive anything of economic value, other than compensation and benefits from the governmental entity to which he is duly entitled, for the performance of the duties and responsibilities of his office or position; however, supplementary compensation or benefits provided to an employee of a public higher education institution, board, or system from funds or property accruing to the benefit of the institution, board, or system as approved by the appropriate policy or management board, through an alumni organization recognized by the management board of a college or university within the state or through a foundation organized by the alumni or other supportive individuals of *448 a college or university within the state the charter of which specifically provides that the purpose of the foundation is to aid said college or university in a philanthropic manner shall be deemed for purposes of this Subsection as compensation and benefits from the government to which he is duly entitled.
(2) Any supplementary compensation or benefits provided to the commissioner of higher education or to an employee of the Board of Regents from funds or property accruing to the benefit of the board as approved by appropriate policy through a foundation organized to support higher education, including the Board of Regents, the charter of which specifically provides that the purpose of the foundation is to aid higher education in a philanthropic manner shall be deemed for purposes of this Subsection as compensation and benefits from the government to which he is duly entitled.
La. R.S. 42:1115 prohibits public servants from receiving gifts or gratuities, in pertinent part:
|1SA. No public servant shall solicit or accept, directly or indirectly, any thing of economic value as a gift or gratuity from any person or from any officer, director, agent, or employee of such person, if such public servant knows or reasonably should know that such person:
(1) Has or is seeking to obtain contractual or other business or financial relationships with the public servant’s agency, or
(2) Is seeking, for compensation, to influence the passage or defeat of legislation by the public servant’s agency.
B. No public employee shall solicit or accept, directly or indirectly, anything of economic value as a gift or gratuity from any person or from any officer, director, agent, or employee of such person, if such public employee knows or reasonably should know that such person:
(1) Conducts operations or activities which are regulated by the public employee’s agency.
(2) Has substantial economic interests which may be substantially affected by the performance or nonperformance of the public employee’s official duty.
La. R.S. 17:3851 provides for the general powers, duties, and functions of college and university boards, including the Southern University System Board. Under these statutes and subject to the powers of the Board of Regents specifically enumerated in Article VIII, Section 5 of the Constitution of Louisiana, and as otherwise provided by law, the Southern University Board has the authority to exercise power necessary to supervise and manage the day-to-day operations of institutions of postsecondary education under its control. Effective January 1, 2011, 2010 La. Acts 992, § 1, consolidated the numerous public retirement systems and created two categories of state systems: a state retirement system, including LASERS, and a statewide retirement system. Prior to this amendment, La. R.S. 11:231 defined average | ^compensation for purposes of retirement benefit compensation for members of LASERS as follows, in pertinent part:
B. For purposes of retirement benefit computation, average compensation, or its equivalent, shall be based on the thirty-six highest successive months of employment, or on the highest thirty-six successive joined months of employment where interruption of service occurred. The earnings to be considered for the thirteenth through the twenty-fourth month shall not exceed one hundred and twenty-five percent of the earnings of the first through the twelfth month. The earnings to be considered for the final twelve months shall not exceed one *449 hundred and twenty-five percent of the earnings of the thirteenth through the twenty-fourth month. Nothing in this Subsection, however, shall change the method of determining the amount of earned compensation received.
La. R.S. 11:403 providing for the meanings of words and phrases used in the Chapter governing the LASERS system provides in (5)(a)(i) and (b)(i) that “average compensation” means “the average annual earned compensation of a state employee.” “Earned compensation” is defined in La. R.S. 11:403(10), in pertinent part, as:
the base pay earned by an employee for a given pay period as reported to the system on a monthly basis by the agency which shall include the cash value of any emolument of office in the form of paid compensation in lieu of salary which is subject to federal and state payroll taxes and includes the full amount earned by an employee, [and] overtime....
“Base pay” is defined in La. R.S. 11:403(6), in pertinent part, as:
prescribed compensation for a specific position on a full-time basis, but does not include overtime, per diem, differential pay, payment in kind, premium pay, or any other allowance for expense authorized and incurred as an incident to employment, except supplemental pay for certain members as provided by Article X, Section 10(A)(1) of the Louisiana Constitution of 1974.
| ^Calculation of Payment for Unused Annual and Sick Leave
The trial judge reasoned the salary supplement and vehicle and housing allowances could not be included in the calculation of the wages due. Thus, the judge calculated the gross amount of the terminal pay as 500 hours at the hourly rate of $105.77 (based on the base pay of $220,000 divided by 2,080, the number of work hours per year), for a total of $52,884.62.
There is no dispute that Dr. Slaughter was entitled to payment by his employing agency, the Board, for 300 hours of unused annual leave and 200 hours of unused sick leave. The evidence shows that the payment received by Dr. Slaughter in his terminal pay was calculated using the gross sum of $100,960.00, based on an hourly rate of $201.92. The Southern University System calculated the hourly rate by dividing the sum of Dr. Slaughter’s base and supplemental salary ($420,000) by 2,080 hours.
However, the parties disagree as to whether the salary supplement and the housing and vehicle allowances should be included in the determination of the hourly rate. Dr. Slaughter contends that the correct hourly rate was $225.00, based on his base pay, salary supplement provided by the Foundation, and vehicle and housing allowances. He argues that the trial judge erroneously concluded that based on the provisions of La. Const. Art. X, § 10 and the statutes enumerated in paragraph 15 of the settlement agreement, his supplemental salary should not be included in the calculation of the hourly rate. Dr. Slaughter also argues because La. R.S. 42:1111 A(l) was excluded from the statutes mentioned in paragraph 15 of his settlement agreement, the provisions of that statute, providing that a salary supplement to an employee of a public higher education board or system shall be adeemed compensation and benefits to the employee, are applicable and govern this issue.
Dr. Slaughter also argues because his supplementary compensation was paid directly into the state treasury and received by him in his regular paycheck, the supplement is compensation to which he is entitled. He further contends that based on *450 the definition of “earned compensation” in La. R.S. 42:1102(22), the amount of his salary supplement and allowances should have been used in the calculation. Moreover, Dr. Slaughter argues that his hourly rate should be based on $468,000, because he paid taxes on that figure, as reflected in his W-2 form, and that amount was used to determine his contributions to the retirement system, LASERS.
The Board contends that an hourly rate of $107.81, based solely on the annual salary of $220,000 paid by Southern University, was proper and that Dr. Slaughter was actually overpaid for the leave, which was erroneously calculated on an annual salary of $420,000. The Board asserts because the Foundation had no obligation to pay the unused leave, the salary supplement should not be part of the calculation of the hourly rate. The Board further argues the salary supplement from the Foundation was combined with the base salary in his payroll from Southern University, instead of being paid separately by the Foundation, because Dr. Slaughter directed that he be paid in that manner. The Board asserts that based on this directive, Dr. Slaughter’s state salary, retirement contributions, and hourly rate were incorrectly calculated by the Southern University human resources department.
119According to the Board, Dr. Slaughter actually owes Southern University. The Board reasons that once the Foundation’s salary supplement is removed from the calculation of the hourly rate and the correct hourly rate of $107.31 per hour is used, the gross amount of the leave pay (before deductions) was $53,658.34. From this sum an amount of $30,431.85 (based on $9,829.00 for the cost of four unlocated computers assigned to Dr. Slaughter, plus $20,602.85 for reimbursements to Dr. Slaughter for renovations and items, including furniture, purchased for the President’s Office and the President’s stadium suite) should be subtracted, for a total of $23,226.49. The Board further asserts Dr. Slaughter lost additional state property (excluding the amount of the four unlocat-ed computers already deducted) that cost $18,772.00, and after this amount is deducted (along with the overpayment of the housing allowance and taxes) from the remaining balance, Dr. Slaughter actually received an overpayment from Southern University.
La. R.S. 23:631 A(l)(a)[3] provides that upon discharge, the employer shall pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month. La. R.S. 23:631, et seq., do not define the phrase “amount then due” or provide guidance for determining whether salary supplements and allowances are included in the hourly rate of pay. For the purposes of La. R.S. 23:631, “wages” are equivalent to “the amount then due under the terms of employment.” Boudreaux v. Hamilton Medical Group, Inc., 94-0879 (La.10/17/94), 644 So.2d 619, 622; Boyd v. Gynecologic Associates of Jefferson Parish, Inc., 08-1263 (La.App. 5th Cir.5/26/09), 15 So.3d 268, 272.
The phrase “whether the employment is by the hour, day, week, or month” in La. R.S. 23:631 refers to the pay period for the compensation. Boudreaux, 644 So.2d at 622. In Boudreaux, the supreme court stated:
Since the phrase in La. R.S. 23:631 “any amount then due under the terms of employment” is modified by the phrase “whether the employment is by the hour, day, week, or month” (pay *451 period), it is obvious that “the amount then due under the terms of employment” set forth in La. R.S. 28:631 refers to wages which are earned during a pay period. In other words, “terms of employment” refers to a particular pay period. Therefore, only compensation that is earned during a pay period will be considered wages under the statutes. This interpretation is consistent with the references to “wages” throughout the statutes.
644 So.2d at 622.
No reported cases address the particular issue of whether a salary supplement or allowances (housing and vehicle) are included in the calculation of the amount due. There is, however, jurisprudence addressing the question of whether other items are amounts due to employees under the wage payment statute. See Jeansonne v. Schmolke, 2009-1467 (La.App. 4th Cir.5/19/10), 40 So.3d 347, 358 (percentage of employer’s profits to terminated at-will employee, was due under an agreement for work already performed, was analogous to commissions, was considered wages due and was not “future wages”); Boyd, 15 So.3d 268, 272 (accrued vacation and sick benefits is an “amount then due under the terms of employment” and constitutes wages; an advance is an unconditional loan with an obligation to repay and is not a payment of wages); Cliburn v. Police Jury Ass’n of Louisiana, Inc., 99-2191 (La.App. 1st Cir.11/3/00), 770 So.2d 899, 905 (accumulated retirement contributions are not wages under wage Inpayment law); Williams v. Dolgencorp., Inc., 2004-139 (La.App. 3d Cir.9/29/04), 888 So.2d 260, 264, writ denied, 2005-0174 (La.3/24/05), 896 So.2d 1042 (bonus under employer’s incentive program was considered wages); Boudreaux, 644 So.2d 619, 622-23 (severance pay due under contract is not payment for services rendered, and thus, La. R.S. 23:631 not applicable); Ward v. Ten-neco Oil Co., 564 So.2d 814, 820 (La.App. 3d Cir.1990) (bonus that employer agreed to pay if employees remained with company until it was sold was not wages for purposes of wage payment law).
Although the employment contract expressly provided Dr. Slaughter’s “earned compensation” shall include his salary supplement of $200,000, other provisions stated “the salary supplement is contingent upon the funds being provided by the Southern University System Foundation.” The settlement agreement, paragraph 15, indicates that the salary supplement must be approved by the Foundation and that the settlement agreement was not contingent upon this approval. Thus, it is clear from these documents that the salary supplement was to be funded by and conditioned upon the actions of the Foundation, not Southern University.
In Shepherd v. City of Baton Rouge/Parish of East Baton Rouge, 588 So.2d 1210 (La.App. 1st Cir.1991), a legal stenographer in the district attorney’s office brought an action against the city, the parish, and the district attorney, seeking to recover payment for unused leave as past due wages. The plaintiff argued that she was an employee of the City-Parish and was entitled under the City-Parish personnel benefits to a greater rate of accrual of leave. The City-Parish maintained that plaintiff was an employee of the District Attorney, and | a2thus, was entitled to payment for less leave. The trial court rendered judgment in favor of the plaintiff and the City-Parish appealed. This court reversed the judgment as to the finding that the City-Parish was the plaintiffs employer. We concluded the City-Parish’s contribution of funds toward the plaintiffs salary does not mandate a finding that the plaintiff is an employee of the City-Parish. In finding that the City- *452 Parish was not liable for wages, benefits, penalties, or attorney fees, we stated:
In determining whether an employer-employee relationship exists, the payment of wages is only one factor; other factors are selection and engagement, the power of dismissal, and the power of control. See Pitcher v. Hydro-Kem Services, 551 So.2d 736 (La.App. 1st Cir.), writ denied, 553 So.2d 466 (La.1989).... Furthermore, although the source of the funds was the City-Parish, his [the District Attorney] was the office which paid Shepherd her wages. Thus, we find that the trial judge erred in finding that Shepherd was an employee of the City-Parish. These assignments of error have merit.
Shepherd, 588 So.2d at 1213-14.
Under La. R.S. 23:631, it is “the duty of the person employing such ... employee to pay the amount then due....” This law governs the obligation and liability of the employer. Herein, the entity employing Dr. Slaughter was Southern University, not the Foundation. Thus, as the trial court reasoned, Southern University was not obligated to pay the salary supplement, the Foundation was not Dr. Slaughter’s employer, and the hourly rate should not include the salary supplement.
Dr. Slaughter also argues that numerous statutory provisions, including those in La. R.S. 42:1111 A and 42:1102(22)(c) in the Code of Governmental Ethics, support his argument that the hourly rate should have been based on $468,000 per year. The Code of Governmental Ethics provides the ethical | ^¡standards for officials and employees of the state and its political subdivisions. The primary objective of the Governmental Ethics Code is to prevent not only the actuality of conflicts of interest, but also to prevent the occurrence of those situations that tend to create a perception of conflicts of interest. In re Ferrara Fire Apparatus, Inc., 2003-0446 (La.App. 1st Cir.12/31/03), 868 So.2d 762, 765.
La. R.S. 42:1102 provides the definitions of words and terms used in the ethics code. Section (22)(c) provides:
Things of economic value shall not include salary and related benefits of the public employee due to his public employment or salary and other emoluments of the office held by the elected official. Salary and related benefits of public employees of higher education institutions, boards, or systems shall include any supplementary compensation, use of property, or other benefits provided to such employees from funds or property accruing to the benefit of the institution, board, or system, as approved by the appropriate policy or management board, from an alumni organization recognized by the management board of a college or university within the state or from a foundation organized by the alumni or other supportive individuals of a college or university within the state the charter of which specifically provides that the purpose of the foundation is to aid said college or university in a philanthropic manner.
Under the provisions of Section 1102, supplementary compensation to employees of higher education boards or systems from organizations, such as the Southern University System Foundation, are expressly excepted from the definition of a thing of economic value and are considered salary of the employee, so as not to infer a conflict of interest and an ethical violation. Because Section 1102 expressly provides (with emphasis added) “[ujnless the context clearly indicates otherwise, the following words and terms, when used in this Chapter, shall have the following meanings,” it is clear that those provisions are limited to 124the ethical code and are *453 not to be used for purposes of determining past due wages.[4]
Herein, the issue is not one of the calculation of LASERS benefits or an interpretation of the retirement statutes for purposes of determining those benefits. Our analysis on the issue of determining the amount due (and the hourly rate) is limited solely to the facts and the issues in this case and does not address Dr. Slaughter’s retirement benefit calculation. Nevertheless, because there is a lack of jurisprudence addressing the method of calculating an amount due under the Wage Payment Law, the parties have presented argument based on the meaning of certain terms, such as compensation, in Louisiana’s retirement statutes.
La. R.S. 11:233 B(l), applicable to several state retirement systems, including the Firefighters’ Retirement System, the Sheriffs Pension and Relief Fund, the Parochial Employees Retirement System of Louisiana, and the Assessors Retirement Fund, specifically provides that “for purposes of calculation of the amount of contributions payable by an employer and employee and for computation of average compensation, earnings or earned or earn-able compensation, or its equivalent, shall mean the full amount earned by an employee | ^for a given pay period.” However, that statute also expressly provides that earnings or earned or earnable compensation shall not include overtime, operating expenses, the use of automobile or motor vehicles, any allowance for expenses incurred as an incident of employment, deferred salary, bonuses, terminal pay, severance and any other type of irregular or nonrecurring payment. La. R.S. 11:233 B(2).
Retirement provisions in Title 11 of the Revised Statutes,[5] applicable to LASERS and other retirement systems, also provide that retirement benefits are based on “average earned compensation.” The “earned compensation” as defined in La. R.S. 11:403(10) means “the base pay earned by an employee for a given pay period as reported to the system on a monthly basis by the agency which shall include the cash value of any emolument of office in the form of paid compensation in lieu of salary which is subject to federal and state payroll taxes.” (Emphasis added.) As defined in La. R.S. 11:403(6), “base pay” means, “prescribed compensation for a specific position on a full-time basis, but does not include overtime, per diem, differential pay, payment in kind, premium pay, or any other allowance for expense authorized and incurred as an incident to employ- *454 merit.” The definition of base pay includes an exception for supplemental pay of sworn, commissioned law enforcement and fire protection officers, from any available funds of the state. See La. Const, art. X, § 10(A)(1)(b). From our reading of these particular retirement statutes, it is clear that the legislature did not intend for supplemental pay or expense allowances to be included in the | ^calculation of compensation for employees who were not law enforcement officers or firefighters and did not fall within the exception.
We further disagree with Dr. Slaughter’s other arguments for including the supplemental pay and expense allowances in the calculation of the hourly rate: that the Foundation’s payment and the expense allowances were included in Dr. Slaughter’s paycheck from Southern University, that taxes were paid on the supplement and allowances,[6] and that his state retirement benefit was calculated on both the supplement and allowances. The record shows that the Southern University payroll department included these amounts in the monthly paycheck based on the personnel action forms.
Ms. Rosie Taylor, a Southern University payroll department employee, testified that she received the personnel action forms from the President’s Office and used these forms to determine how to pay Dr. Slaughter. Ms. Taylor acknowledged that Dr. Slaughter’s earnings, as reported to the Internal Revenue Service and the State Department of Revenue, included the supplement paid by the Foundation. The payment for accrued leave was calculated by the Human Resources department, which included the salary supplement in the calculation and sent those figures to the payroll department.
Mr. Ernie Troy Hughes, the Foundation’s Executive Director during Dr. Slaughter’s tenure, testified that the University and the Foundation formed a corporate endeavor to work together. The Foundation had multiple accounts, was “the closest thing to a bank” for the University, and Dr. Slaughter had control of 127two of the Foundation’s accounts, the Bayou Classic and the System Development accounts. Mr. Hughes explained that Dr. Slaughter would obtain reimbursement checks from the Foundation through the use of the form authorizing disbursement and by attaching receipts; payment was processed and sent to Dr. Slaughter after submission of these forms. Dr. Slaughter also had the authority to transfer money from the Bayou Classic account to the Foundation and from the Foundation to himself.
Moreover, Dr. Slaughter directed the Foundation to pay his salary supplements by means of direct transfer from either the Bayou Classic account or the Foundation account into the Southern University account. Dr. Slaughter used disbursement forms to obtain these transfers of the salary supplements. Mr. Hughes testified the salary supplements could have been paid directly to Dr. Slaughter from the Foundation and that he did not know why Dr. Slaughter wanted those amounts to be paid to him through the University. At the time of these disbursements, Mr. Richard Turnley was the Foundation President, but Dr. Slaughter worked closely with the Foundation’s Treasurer. Mr. Hughes further admitted he did not question Mr. Turnley about the salary supplement; nor did he receive any direction from Mr. Turnley.
Mr. Hughes also acknowledged a letter, dated September 25, 2007, that he wrote to *455 Mr. Tolor White, the System Finance Vice President, indicating the Foundation “will support and make salary supplements” for Dr. Slaughter’s extra compensation. Mr. Hughes testified when Mr. White brought him the prepared letter, he changed the wording from “approve” to “support” the salary supplements and added the phrase “funds designated for that purpose.” According to Mr. | gjHughes, the intent of the wording “and make salary supplements” was to indicate that a check from the Foundation would be made out to Dr. Slaughter.
Mr. Hughes further admitted the Foundation assumed all requests made for disbursements were for the benefit of the University. Although he suggested changes in the policies and procedures for disbursements, Dr. Slaughter did not agree to any changes that would affect his ability to approve his own requests for disbursement of funds. In further questioning, Mr. Hughes was asked about whether it was permissible for the Foundation to pay for certain items; he concluded the Foundation was permitted to purchase a television for Dr. Slaughter’s Office, but was not authorized to pay legal fees of an attorney who sued Southern University.[7] He admitted he had questioned some of Dr. Slaughter’s reimbursement requests, including a reimbursement made to Dr. Slaughter’s wife for the her purchase of tickets to charitable fundraisers. Mr. Hughes also did not believe that the Foundation’s by-laws authorized reimbursement for moving items to Dr. Slaughter’s home when his contract ended.
Based on our review of the evidence presented, we find no error in the trial court’s determination that the salary supplement and housing and vehicle allowances should not be used in the leave pay calculation. The trial judge apparently believed the testimony that Dr. Slaughter’s own actions were responsible for the inclusion of the salary supplement and allowances in his regular monthly payment by Southern University. The fact that taxes were paid and retirement benefits were calculated using the salary supplement and 1 ^allowances are not support for Dr. Slaughter’s position, given that he manipulated the system and used his position for his own benefit.
Offsets
Another issue is whether the Board could deduct and offset from the terminal pay an amount attributable to the cost of property taken by Dr. Slaughter or for unlocated items that were Dr. Slaughter’s responsibility.
Dr. Slaughter argues the trial judge’s deduction for these items was improper because those items were actually the property of the Foundation and that the Board cannot “collect” on a debt owed to the Foundation. Dr. Slaughter also contends there was no evidence these items were placed into the statewide inventory system. According to Dr. Slaughter, he could not be charged for the unlocated items because under La. R.S. 39:330, the property manager of each agency is the custodian of and responsible for all of the agency’s property, unless the manager requires the person receiving the property to sign a receipt; he contends there was no evidence that he ever signed a receipt for these items. He also contends that under La. R.S. 39:330(F), only the Commissioner of Administration could decide what action could be taken after an investigation of *456 lost, stolen, or otherwise unaccounted for property.
The Board contends that there was un-contradicted evidence that when Dr. Slaughter left his position, he took items from the President’s office and stadium suite. It argues that numerous exhibits show these items were purchased by the Foundation based on Dr. Slaughter’s request and authorization and that the items were specifically assigned to Dr. Slaughter through the University property control process. The Board notes that the testimony of Mr. Floyd Rector, a supervisor in lanthe LPAA compliance office that conducted the audit of the missing property, and Ms. Althea Basil, the Southern University System property manager, confirms all of the items were paid for using Foundation funds, belonged to the University, and were taken by Dr. Slaughter. The Board further contends the evidence shows Southern University used the tagging inventory required by the state on all items, except for those in the President’s Office, that Dr. Slaughter signed the 2008 and 2009 inventories that included these items, and that as “head of the agency,” Dr. Slaughter was responsible for this property. The Board further asserts that Mr. Graylin Hammond, an administrative specialist in the President’s Office who handled inventory, testified that only unlo-cated items that were specifically assigned to Dr. Slaughter were included in the offset.
La. R.S. 23:685 provides an employer may not assess a “fine” against an employee, except when the employee willfully or negligently damages goods or property of the employer or in cases where the employee is convicted or has pled guilty to the crime of theft of employer funds. “Fines” within the meaning of the statute are pecuniary penalties imposed for violation of some law, rule, or regulation. Brown v. Navarre Chevrolet, Inc., 610 So.2d 165, 170 (La.App. 3d Cir.1992). Since this statute is coercive and penal in nature, it must be strictly construed, must not be extended beyond its clear unambiguous language, and must yield to equitable defenses. See Hays v. Louisiana Wild Life & Fisheries Commission, 165 So.2d 556, 565 (La.App. 1st Cir.1964).
A review of the jurisprudence on this issue indicates that not all deductions from an employee’s pay are prohibited fines. The cases indicate that when an employee is aware of the employer’s policy of authorizing deductions, the |S1 amounts deducted pursuant to that known policy have not been considered fines. See Cupp v. Banks, 25,762 (La.App.2d Cir.5/4/94), 637 So.2d 678, 679-80 (where employee admitted employer had advised the cost of the repair parts would be deducted from his wages, if he damaged any additional farm equipment and the trial court found the employee accepted this condition as term of his employment, the deduction from the employee’s wages was justified and was not considered a fine). See also Stell v. Caylor, 223 So.2d 423 (La.App. 3d Cir. 1969) (contract providing the employee pay a deposit for equipment and monies issued did not constitute a fine; court found the amount was simply a sum to insure the return of any equipment or monies issued and reserved to employer the right to check all books, pay slips and reports).
In Moore v. Fleming Subway Restaurants, Inc., 28,543 (La.App.2d Cir.8/21/96), 680 So.2d 78, 80-81, the plaintiffs were discharged for failing to make hourly drops of cash, as provided in the employee handbook. In addition, the employer withheld from their wages an amount to offset the amount of money taken in a robbery. The second circuit concluded that the employee handbook introduced into evidence did not contain any specific notice that an *457 employee’s wages could be forfeited if a worker failed to perform drops and the store was subsequently robbed. Nor did the record contain evidence that plaintiffs were aware of or consented to such a sanction. The second circuit determined the trial court was clearly wrong in finding that the employer was entitled to withhold plaintiffs’ wages as reimbursement for the amount of money taken in the robbery and reversed the judgment of the trial court. In Henderson v. Kentwood Spring Water, Inc., 583 So.2d 1227, 1231 (La.App. 1st Cir.1991), the employer ^¡¡withheld money from a worker’s wages as recompense for the cost of uniforms and lost equipment. This court upheld the trial court’s finding that the employee was not responsible for those costs because he was unaware of the company policies requiring employees to purchase uniforms and pay for lost equipment and the employer’s written procedures did not specifically mention these requirements.
There is only one reported case addressing missing equipment. In Glover v. Diving Services Intern., Inc., 577 So.2d 1103 (La.App. 1st Cir.1991), this court determined the employer was not authorized to deduct the cost of missing equipment from an employee’s paycheck, absent evidence that the employee willfully or negligently damaged the employer’s property. The employee acknowledged signing a master service agreement that provided in the event equipment returned from a job was not washed, cleaned, properly stored, and appropriately tagged, an appropriate fee would be deducted. The trial court determined that the agreement did not authorize the disputed deduction because it was merely a safety notice and regulation from the employer to its employees. The trial court further determined that the agreement’s provisions merely provided a procedure whereby deficiencies or problems in equipment could be corrected and the shop and headquarters could be kept in a clean and appropriate manner.
On appeal, this court concluded the evidence was in dispute as to whether the employee ever received the agreement and employee handbook. Moreover, we concluded La. R.S. 23:635 was inapplicable because no fine had been imposed. We determined the deduction from the employee’s paycheck was for the purpose of covering a loss rather than imposing a punishment and, therefore, was not a fine. Because the agreement did not authorize the disputed deduction, we [^concluded the employee was entitled to recover the sum of the unpaid wages. Glover, 577 So.2d at 1107-08.
Herein, the evidence shows that Dr. Slaughter was aware of the university policy that all employees must complete the check-out process before receiving their terminal pay. Dr. Slaughter introduced the check-out form into evidence. This form, which served as the catalyst for an employee to receive his terminal pay, expressly stated the university’s policy that department head signatures were necessary to certify the employee’s financial responsibilities were cleared prior to release of the employee’s final pay check. The form specifically states “where financial obligations are indicated above, funds will be deducted from the employees’ terminal pay.” Dr. Slaughter prepared his checkout form, but asked his administrative assistant, Ms. Frances Smith, to obtain the required signatures. Ms. Smith testified that after Dr. Slaughter’s last day, several items were missing and all the required signatures, including that of Interim System President Freeman, had not been obtained to authorize processing of Dr. Slaughter’s terminal pay.
Moreover, there was testimony of several Southern University employees and doc *458 umentation from internal inventories and state audits that numerous items, purchased for the benefit of Southern University, were missing from and not returned to the System President’s office and stadium suite. In his own testimony, Dr. Slaughter admitted to having taken many items, including a desk, chair, and sofa from his office. Although Dr. Slaughter claimed he purchased and owned the items, he could not provide a list of the items or proof that he had purchased them. Other testimony and exhibits indicate the Foundation paid for renovations and | ^numerous items for use in and for the benefit of the President’s office and suite. These items did not become the personal property of Dr. Slaughter. To the contrary, a Foundation memo written on September 5, 2009, from Mr. Hughes to Dr. Freeman and an internal auditor indicates the Foundation’s “intent that all property and/or disbursements must be for the benefit of the university and not for the private inurnment of any individual.” Moreover, the Foundation’s purchase of items for Dr. Slaughter’s personal benefit would have jeopardized the Foundation’s non-profit status and possibly resulted in ethical violations.
The evidence shows that Dr. Slaughter knew of the policy that an employee must complete the check-out form and that an accounting of items must be made before terminal pay is released. Thus, the deductions and offsets for the missing items were conducted in accordance with the employment policy and did not constitute a prohibited fine. Accordingly, we find no manifest error in the trial court’s determination that the offsets for missing property were proper.
Housing Allowance Overpayment
Dr. Slaughter contends that the trial court improperly concluded his terminal pay included an overpayment of the housing allowance for the month of July 2009, and thus, the Board properly deducted that amount from his terminal pay. Dr. Slaughter claims that no evidence was presented that he was overpaid for one month of the housing allowance. The Board counters that there was uncontradicted testimony that indicated Dr. Slaughter received an extra housing allowance payment.
Ms. Rosie Taylor, the employee who handled Dr. Slaughter’s payroll, testified as to the authorization for and instructions of how housing and | .^automobile allowances were to be paid to several Southern University System Chancellors and the System President, Dr. Slaughter. A memorandum, on Southern University System letterhead, dated May 27, 2008, from Mr. White, the Southern University Vice-President for Finance, to Mrs. Carey Clark, an account supervisor, provided, “Payments are to be made in equal monthly installments, with the appropriate amount being due and payable on the first (1st) day of each calendar month, unless otherwise directed by the Southern University Board of Supervisors.” Ms. Taylor testified that she always paid the housing allowances a month in advance and that in the last payroll conducted for Dr. Slaughter he was paid a housing allowance for July 1, 2009. Ms. Taylor further testified that she had audited Dr. Slaughter’s housing allowance payments and determined that although he was supposed to be paid for 89 months of the housing allowance, he actually received that allowance for 40 months. She noted that an amount equal to one month’s housing allowance was accidentally included in Dr. Slaughter’s last paycheck and she conveyed that information to her supervisor.
On cross-examination, Ms. Taylor agreed that Dr. Slaughter “was paid at the end of every month,” “never got ... a *459 separate housing allowance check at the beginning of [every] month,” and started receiving the housing allowance in his check at the end of April 2006, his first month as the System President. She further admitted that Dr. Slaughter’s checks dated at the end of May and June 2006 included the housing allowance. However, on re-direct questioning by the Board’s attorney, Ms. Taylor explained that on June 80, 2006, after her office reviewed Dr. Slaughter’s housing allowances, it was discovered that he had not received the allowances in advance. According to Ms. Taylor, to compensate for |Sfithis error, a single check for the housing allowance was processed and paid to Dr. Slaughter in July 2006.
Based on the testimony of Ms. Taylor, the evidence shows that Dr. Slaughter’s last check on June 80, 2009, included an advance of the housing allowance for the month of July 2009. Dr. Slaughter was not entitled to a housing allowance for July 2009, because he was no longer employed as the System President. Thus, the deduction for this amount was proper. The trial court was not manifestly erroneous in finding that Dr. Slaughter was overpaid for one month housing allowance and concluding that the deduction for this amount was proper. Accordingly, this assignment of error lacks merit.
Retirement Recalculation
Dr. Slaughter contends that the trial court erred in issuing a ruling “effectively ordering LASERS to ‘recalculate’ [his] retirement” based on the amount of $220,000 instead of the full earned compensation of $468,000. He argues that not only was the ruling erroneous, the issue was not before the trial court.
Herein, a review of the written judgment clearly shows that there was no ruling or order to LASERS to recalculate Dr. Slaughter’s retirement benefit. The trial judge merely mentioned LASERS in his explanation for the calculation of the terminal pay. He reasoned, as we did in our discussion above, that under the Louisiana Constitution, salary supplements and vehicle and housing allowances are not included in the calculation of retirement or severance benefits by LASERS. It is difficult for us to understand how Dr. Slaughter could arrive at his 1 ^interpretation that the judgment ordered LASERS to recalculate his retirement benefit.
Nevertheless, we note that the jurisprudence holds that if there is any conflict between a written judgment and written reasons, the language of the judgment controls. See Delahoussaye v. Board of Sup’rs of Community and Technical Colleges, 2004-0515 (La.App. 1st Cir.3/24/05), 906 So.2d 646, 654. The same reasoning obviously applies in the case of a conflict between a written judgment and oral reasons for judgment. Accordingly, there is no merit to this assignment of error.
Motion for New Trial & Motion to Supplement and Amend Motion for New Trial
After the oral judgment was rendered, Dr. Slaughter filed a motion for new trial based on the trial judge’s failure to disclose that his wife, Angele Davis, was the Commissioner of Administration and directly responsible for the LPAA, the agency that conducted the inventory of the property in the President’s Office. Two weeks later, Dr. Slaughter filed a supplemental and amending motion for new trial, asserting that after judgment was rendered he located “e-mails regarding his earned compensation including e-mails to him from SU Foundation Attorney, Preston Castille, and Ernie Hughes, dating from 2007, clearly showing that the SU Foundation was fully aware of and partiei- *460 pated directly in its commitment to fund supplementary compensation to the plaintiff as part of his ‘earned compensation.’ ” The evidence attached to the motion for new trial consisted of several e-mails, primarily dated between July and September 2007 during the period of negotiation of Dr. Slaughter’s contract; several different contracts between the Tiger Athletic | .^Foundation and Nick Sabin; and letters from the LSU System or Board of Supervisors to Dr. John Lombardi and Mr. Sean O’Keefe regarding the terms of their employment.
Dr. Slaughter asserts that the evidence could not have been located with due diligence because it would have required several days of effort on his part. He further asserted that the importance of the evidence was not apparent and he was not in a position to discover the need for the evidence until Mr. Ernie Troy Hughes testified and the trial court issued its ruling in the wage suit. However, Dr. Slaughter admits that the evidence was obtained from Preston Castille, the Foundation’s attorney, during the negotiation of his employment contract, as the Southern University System President.
The Board responds that although the evidence was known, available, and within the control of Dr. Slaughter prior to the trial, he chose not to present it at trial. The Board further contends that it was not error for the trial court to summarily deny the motion for new trial because the evidence was available and could have been discovered with due diligence.
A peremptory ground for a new trial exists “[w]hen the [moving] party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.” La. C.C.P. art. 1972(2). A new trial may also be granted in any case if there is a good ground therefor, except as provided by law. La. C.C.P. art. 1973. The standard of review of a judgment on a motion for new trial, whether on peremptory or discretionary grounds, is that of abuse of discretion. Magee v. Pittman, 98-1164 (La.App. 1st Cir.5/12/00), 761 So.2d 731, 746, writ denied, 2000-1694 (La.9/22/00), 768 39So.2d 31. The breadth of the trial court’s discretion to order a new trial varies with the facts and circumstances of each case. Horton v. Mayeaux, 2005-1704 (La.5/30/06), 931 So.2d 338, 344.
To meet his burden of proof on a motion for new trial based upon newly discovered evidence, the mover must show that such evidence: 1) is not merely cumulative; 2) would tend to change the result of the case; 3) was discovered after trial; and 4) could not, with due diligence, have been obtained before or during trial. Thomas v. Comfort Center of Monroe, LA, Inc., 2010-0494 (La.App. 1st Cir.10/29/10), 48 So.3d 1228, 1240-41; Couvillion v. Shelter Mut. Ins. Co., 95-1186 (La.App. 1st Cir.4/4/96), 672 So.2d 277, 282-83.
Herein, Dr. Slaughter admits that the motion for new trial was based on evidence that he already knew existed, but would take time to find. Thus, this evidence was not newly discovered and could have been obtained before the trial. Moreover, even if this evidence was newly discovered, there has been no showing that it would have changed the result.
We likewise believe that the other grounds for new trial (that Judge Kelley was biased against Dr. Slaughter and his attorney and failed to disclose his spouse was the Commissioner of Administration) lack merit. Dr. Slaughter’s attorney, Ms. Craft, knew Judge Kelley was married to the Commissioner of Administration, Ms. Davis. Ms. Craft acknowledged on the record at trial that she had seen a letter from the LPAA, the state agency that *461 conducted an audit of the items missing from the President’s Office. The letterhead clearly indicates that LPAA is an agency under the Division of Administration. Thus, Ms. Craft knew before the trial that there was the possibility that Ms. Davis’ name or position |4nwould be mentioned or that state employees of an agency under the auspices of the Division of Administration would testify at trial.
Accordingly, we find no abuse of discretion in the trial court’s denial of the motion for new trial and the motion to supplement and amend the motion for new trial.
Penalties and Attorney Fees
Dr. Slaughter contends that the district court erred in refusing to award penalty wages and attorney fees under La. R.S. 23:632. He asserts that the Board refused to tender the wages due, despite his written demands. He specifically notes that on July 10, 2009, the Board acknowledged receipt of the demand for payment of his accrued leave, but waited until after his lawsuit was filed to make a “tender” of any amount. Dr. Slaughter contends that the wage payment law provides in a “well-founded” lawsuit, attorney fees are not subject to equitable defenses and because he was forced to file suit to obtain payment of the wages due, he is entitled to attorney fees.
Dr. Slaughter further argues he is entitled to penalties because the off-sets were not made in good faith and were not proper under the law. He reiterates his argument that there was no evidence that the offsets were for property owned by the Board and that the offsets were actually an unauthorized “collection activity” on behalf of the Foundation.
The Board argues that because Dr. Slaughter failed to comply with the University’s check-out procedure and was responsible for unaccounted items, he was not entitled to an award of penalties or attorney fees.
|41To recover penalty wages under La. R.S. 23:632, the plaintiff must show that: 1) wages were due and owing; 2) demand for payment thereof was made where the employee was customarily paid; and 3) the employer did not pay upon demand. Schuyten v. Superior Systems, Inc., 2005-2358 (La.App. 1st Cir.12/28/06), 952 So.2d 98, 102. Although the statutory language provides for an award of penalty wages upon nonpayment, the jurisprudence has allowed the employer to assert equitable defenses to such a claim. Because the statute is penal, it must be strictly construed. The jurisprudence provides that penalties will not be imposed on the employer when it presents a good faith, non-arbitrary defense to its liability for unpaid wages. A trial court’s determination concerning whether a defendant employer is in bad faith is a factual question subject to the manifest error/clearly wrong standard of review. Schuyten, 952 So.2d at 102-03.
Herein, based on our review of the record, we find no manifest error in the trial court’s ruling denying penalties and attorney fees based on a bona fide dispute between the parties. Because a determination of the amount of the setoff required an inventory of the property, the delay caused by the inventory and audits was warranted. Moreover, since no wages were due and the lawsuit was not well-founded, Dr. Slaughter was not entitled to penalties and attorney fees.
Accordingly, this assignment of error lacks merit.
Recusal
At the onset, we note that Dr. Slaughter assigns as error the district court’s error “in refusing to recuse itself,” but his argument actually focuses on the ruling by *462 Judge Wilson Fields denying the motion to recuse Judge Kelley. Moreover, in arguing the denial of the recusal was erroneous, Dr. Slaughter cites reasons issued |42by Judge Kelley on the sanctions issue. We find these references to be confusing and misleading.
Dr. Slaughter also argues that the district court erred in finding that Dr. Slaughter’s counsel, and not Judge Kelley, had the obligation to inform him of the judge’s relationship to the Commissioner of Administration and in finding that Judge Kelley was not biased in favor of the Board and its attorney. Dr. Slaughter further argues that the recusal motion was timely because he could not have anticipated that Ms. Davis’ name would be mentioned during the testimony of the last two witnesses and that Judge Kelley would rely on Ms. Davis’ order to Southern University to “tag” computers in the President’s Office in rendering judgment.
In denying the motion to recuse, Judge Fields stated there were two issues presented by Dr. Slaughter: 1) the relationship of the Commissioner of Administration to Judge Kelley, and 2) bias toward Dr. Slaughter and Ms. Craft. Judge Fields concluded the recusal was not warranted based on the Judge’s relationship to Ms. Davis. He reasoned that Dr. Slaughter’s counsel knew of the relationship and that Ms. Davis’ name was not mentioned until the last two trial witnesses. Judge Fields further concluded that based on his review of the trial record, he did not find Judge Kelley was biased.
Dr. Slaughter argues the evidence of bias in the instant case is far more substantial than the evidence presented in Succession of Ratcliff v. Fruge, 99-575 (La.App. 3d Cir.12/8/99), 755 So.2d 918, 923, where the third circuit concluded that the trial judge’s words and actions demonstrated bias and prejudice sufficient for recusal and reversed the trial court’s denial of motions to recuse and new trial | abased on a claim of judicial bias. The third circuit concluded the trial judge rejected a stipulation by all the parties, had refused to appoint an attorney for unrepresented parties, and had issued instructions that defied a prior ruling of the appellate court.
As evidence of judicial bias in the instant case, Dr. Slaughter contends the record reflects that Judge Kelley supplied objections for the Board and its counsel; openly mocked his attorney, Ms. Craft; referred to Dr. Slaughter’s testimony as the “least credible” in his thirteen years as a judge; made prejudicial comments during the sanctions hearing; and ordered that LASERS recalculate Dr. Slaughter’s retirement benefits.
The Board responds the motion to re-cuse was untimely because Dr. Slaughter’s attorney had knowledge of the relationship between Judge Kelley and Ms. Davis prior to filing of the lawsuit.
A full discussion of the factual basis asserted by Dr. Slaughter for the motion to recuse Judge Kelley and the procedural history of that motion is presented in Slaughter v. Board of Sup’rs, 2010-1114 (La.App. 1st Cir.8/2/11), 76 So.3d 465, 468-69, also rendered this date. In that appeal, we noted that the motion to recuse was untimely because Dr. Slaughter’s attorney knew of the grounds regarding the relationship with the Commission of Administration for over one year before the motion was filed. The knowledge of an attorney, actual or otherwise, is imputed to his or her client. See Stevison v. Charles St. Dizier, Ltd., 2008-887 (La.App. 3d Cir.3/25/09), 9 So.3d 978, 981, writ denied, 2009-1147 (La.10/2/09), 18 So.3d 116.
144Moreover, we find no error in the conclusion of the district court judge, *463 Judge Wilson Fields, that the motion to recuse Judge Kelley was unfounded. Our review indicates the record does not support the allegations that Judge Kelley was biased and prejudiced against Dr. Slaughter and his attorney. Accordingly, this assignment lacks merit.
Motion to Supplement Appellate Record
The transcript of the recusal hearing before Judge Fields reveals the existence of an audio recording secretly made by Dr. Slaughter during the sanctions hearing before Judge Kelley. Judge Fields, who expressed concern about the recording and whether Dr. Slaughter was also recording the recusal hearing, ordered Dr. Slaughter to turn over the recording and that it be placed under seal. However, Judge Fields also noted that the recording was not a court exhibit. There is no indication that the recording was played during the recusal hearing or that Judge Fields based his ruling on that recording.
After Judge Fields denied the motion to recuse Judge Kelley, Dr. Slaughter filed a motion to supplement the record in this appeal with the transcript of the recusal hearing and “any and all evidence introduced at the proceeding on July 12, 2010, including the audio recording that was placed under seal.” On August 17, 2010, Judge Fields signed an order granting the motion to supplement the record, but limited the supplement to the transcript of the proceedings, the documentary evidence, the oral reasons for judgment, and the signed judgment. The order was denied “in all other respects.”
After the appeal record was lodged, Dr. Slaughter filed in this court a motion to supplement the appellate record with the audio recording. In his [^motion, Dr. Slaughter alleges and infers that the recording was introduced as evidence in the lower court. However, as noted above, it is clear from the transcript that although Judge Fields placed the recording under seal, it was not admitted into evidence.
In Greenfield v. Lykes Bros. S.S. Co., 2002-1377 (La.App. 1st Cir.5/09/03), 848 So.2d 30, 33-34, and Williams Law Firm v. Bd. of Sup’rs of Louisiana State University, 2003-0079 (La.App. 1st Cir.4/02/04), 878 So.2d 557, 562, this court held that it lacks jurisdiction to order evidence filed into the appellate record where it was never filed into the district court record. Accordingly, Dr. Slaughter’s motion to supplement the appellate record is denied.
Judgment Deficiencies
Having affirmed the determinations in trial court’s judgment, our review reveals that the trial court failed to articulate that all Dr. Slaughter’s claims were, accordingly, dismissed. Also, while the preamble to the judgment duly notes that legal representation was made on behalf of defendant “Board of Supervisors of Southern University,” in its orders, reference is made to this defendant as “Southern University.” Although we find neither of these deficiencies fatal to the finality of the judgment, see La. C.C.P. art. 1841, for clarity the judgment is modified to more particularly articulate the scope of the dismissal and the identity of the defendant. See La. C.C.P. art. 2164; see also Jenkins v. Recovery Technology Investors, 2002-1788 (La.App. 1st Cir.6/27/03), 858 So.2d 598, 600 (a final appealable judgment must contain decretal language, and it must name the party in favor of whom the ruling is ordered, the party against whom the ruling is ordered, and the relief that is granted or denied).
1 ^DECREE
For these reasons, we amend the trial court’s judgment to replace all references to “Southern University” with “the Board *464 of Supervisors of Southern University.” Additionally, after the statement, “Therefore, Dr. Slaughter is not entitled to any additional payments from [the Board of Supervisors of Southern University],” the judgment is amended to include an additional paragraph that states, “Accordingly, all of Dr. Slaughter’s claims against the Board of Supervisors of Southern University are dismissed.” In all other respects, we affirm the trial court’s judgment, denying Dr. Slaughter’s claim for past due wages, penalties, and attorney fees. The motion to supplement the appellate record is denied.
AMENDED, AND AS AMENDED, AFFIRMED. MOTION TO SUPPLEMENT DENIED.
HIGGINBOTHAM, J., concurs in part, dissents in part, and assigns reasons.

 The total disputed amount is for property that is currently unbeatable by the offices of Louisiana Property Assistance (LPAA) and Southern University Board of Supervisors Office of Internal Audit. The LPAA has determined that four (4) of the eleven (11) items assigned directly to you cannot be located. The total cost of these four (4) items is $9,829.00. The Southern University System Foundation (Foundation) provided documentation that they reimbursed you for renovations to the President’s office in the J.S. Clark Administration Building and the President’s Suite in A.W. Mumford Stadium. Moreover, the Foundation reimbursed Dr. Slaughter for furniture and other items purchased for the newly renovated areas. The total amount reimbursed for renovations and purchases was $20,602.85. As of the date of this letter, the Internal Auditors are trying to determine the location and ownership of the above-mentioned property. Until that determination is made, Southern University has withheld $30,431.85 (9,829.00 + 20,602.85) from your terminal payment. It is our hope to resolve this matter as soon as possible.

. After the trial judge rendered judgment and oral reasons, but before the written judgment was signed, Dr. Slaughter filed a motion to recuse Judge Kelley. After the motion to re-cuse Judge Kelley was alloted to Judge Clark, Dr. Slaughter filed a motion to recuse Judge Clark. After Judge Clark denied both motions to recuse, Judge Kelley signed the written judgment as to the claim for past due wages. Thereafter, the Board filed a motion for sanctions, arguing that the motions to recuse were based on false grounds and frivolous. Judge Kelley ruled in favor of the Board and ordered Dr. Slaughter to pay sanctions, attorney fees, and costs. The appeal of that judgment is addressed in this court’s opinion in Slaughter v. Board, 76 So.3d 465, also rendered this date.

. In our review of the record, we have not found any memoranda filed by defendant that primarily addresses Louisiana state property control.

. In Stafford v. City of Baton Rouge, 403 So.2d 733, 734 (La.1981), the Louisiana Supreme Court held that La. R.S. 23:631 applied to governmental employers.

. In the Louisiana Board of Ethics (Ethics Board) opinion issued in Re: In the matter of Gregory O'Brien, Opinion No. 2003-973 (March 10, 2005), the Ethics Board conducted an investigation to determine whether or not the Chancellor of the University of New Orleans (UNO) violated Section 1111 A(l) of the Governmental Ethics Code by virtue of salary supplements, business expense advances and expense payments from foundations affiliated with UNO. The Ethics Commission noted other chancellors and university presidents within the LSU systems were receiving similar supplemental salary payments from other university-affiliated foundations and that 1986 La. Acts 359 amended the law and created an exception to the usual prohibition against public employees receiving things of economic value. The Commission further stated that the amendment provided an exception applicable only to employees of a higher education institution, board, or system and allowed a public servant who is an employee of those entities to receive supplementary compensation of benefits, including supplemental pay from certain organizations affiliated with their employer if such funds were “approved by the appropriate policy or management board” of that institution.

. See 2010 La. Acts, No. 992 § 1, effective January 1, 2011.

. Dr. Slaughter’s 2008 W-2 form indicates his wages were $426,717.28, an amount that obviously included the salary supplement and allowances.

. This was a reference to the Foundation’s payment of Ms. Craft's legal fees for her representation of Dr. Slaughter in the civil rights retaliation lawsuit he filed against Southern University, which was settled and dismissed as part of Dr. Slaughter’s employment contract.